J-A24015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES J. OWENS | : | |
| | : | |
| Appellant | : | No. 1433 MDA 2024 |

Appeal from the Judgment of Sentence Entered September 3, 2024
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0000435-2023

BEFORE:  DUBOW, J., KUNSELMAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED DECEMBER 30, 2025**

James J. Owens ("Owens") appeals from the judgment of sentence entered in the Luzerne County Court of Common Pleas ("trial court") following his convictions of three theft crimes, all of which relate to a contractual dispute for home renovation services.  After careful review, we agree that the Commonwealth failed to present sufficient evidence to support any of his convictions.  We therefore vacate his judgment of sentence and discharge Owens.

In September of 2018 Sara Zydallas ("Zydallas") contracted with Owens to repair "damage in [her] home."  N.T., 4/16-17/2024, at 27.  The "[s]ewer pipes had broken inside between the kitchen and the bathroom wall," requiring replacement of the cabinets and flooring.  *Id.* at 27-28.  She and Owens signed a contract for a "repair [and] remodel" of Zydallas' property, "including

repairing all rotted framing [and] sheathing," a "new roof over back porch," installing "new kitchen cabinets [and] flooring," and "remodeling laundry room." **See** Commonwealth's Exhibit 1. Owens also agreed to construct an addition, which Zydallas described at trial as "an enclosed sunroom[.]" N.T., 4/16-17/2024, at 30.

The contract called for Owens to "construct[] a [ten]x[twenty] addition to code, and siding to new and existing structure," plus "replacing windows with new construction windows[.]" Commonwealth's Exhibit 1. The total cost was listed as $34,400.00. **Id.** On September 7, 2018, Zydallas submitted a building permit application, as required by the local township, and listed Owens as the contractor. **See** Commonwealth's Exhibit 19.

Owens received $32,500 upfront in the form of four cashier's checks, each of which was purchased by Gregory Panatieri.[1] The first check, drawn in the amount of $14,000, was issued on September 7, 2018. The second, for $3,200, was issued on September 25, 2018. The remaining two cashier's checks were issued on October 1, 2018, both in the amount of $7,650. The Commonwealth admitted copies of these four checks. **See** Commonwealth's Exhibit 2.

---

[1] Panatieri did not testify. Zydallas explained that Panatieri was her then-boyfriend and the funds were hers. She testified that it "was just a matter of convenience for [Panatieri] to withdraw the money and hand it to [Owens] with my job and working schedule and [Owens'] schedule." N.T., 4/16-17/2024, at 32.

Owens told Zydallas that "the inside work" would "hopefully" be completed by Thanksgiving of 2018. N.T., 4/16-17/2024, at 35. Work began on an unspecified date, and Zydallas testified that as Thanksgiving approached Owens had completed some interior work. However, he had discovered "some water damage" when Owens removed the "back wall of the back room[.]"[2] *Id.* Owens "replaced the studs and installed the window, took out the two walls for the utility closet[,] and that was it." *Id.* Around this time, Owens cited various complications and informed Zydallas that "he couldn't do the inside work until the outside was completed." *Id.* at 36.

Zydallas' testimony then skipped ahead to "summer of 2019," at which point the interior work remained stalled. Owens informed her that "the electrical box" outside had to be moved as its present location "was holding up the outside building." *Id.* Around this same time, Zydallas filed for a new permit with respect to the sunroom. The application indicated that the planned sunroom had expanded in size to ten feet by thirty-three feet, plus an eighteen-foot bump-out. *Id.* at 55-56. Zydallas and Owens did not sign any new contract. *Id.* at 73.

Zydallas became increasingly dissatisfied with Owens. Owens installed kitchen cabinets but she "found out they were [mounted] with drywall screws and not cabinet screws[.]" *Id.* at 38. Zydallas also "mentioned to [Owens]"

_____

[2] This is presumably where the sunroom would adjoin the existing structure.

a water leak inside, and Owens "opened up the living room ceiling [fourteen] feet from one to another to look at the plumbing." *Id.* Owens informed her that the original "cooper [sic] plumbing ... was compromised" and needed to be replaced. *Id.* He reportedly said she would need to replace "all the plumbing in the home with PEX lines" and she "gave him the money for the plumbing job to be done." *Id.* at 39. Owens installed the new lines, but Zydallas later discovered that the lines were not operational and "water had been running through ... the copper lines ... the whole time." *Id.* at 43.

In May of 2021, Zydallas "ask[ed] [Owens] about the materials," specifically those related to the masonry work for the sunroom. Owens "told [her] that the masons were in Canada [and] couldn't cross the border." *Id.* at 39. Zydallas then asked if the materials could be delivered to her home, and Owens stated that "he was going to meet ... the [z]oning [o]fficer." *Id.* Owens explained that the officer "needed to look at some wiring or make an inspection at some point" for work to progress on the addition. *Id.* at 40. Zydallas eventually called the zoning officer and, based on that conversation, opted to terminate the contract with Owens. *Id.* at 41.

In June of 2021, Zydallas asked Owens to return various materials that she had separately purchased. These materials included a "heating and air conditioning unit," as well as "composite decking for the addition, posts to hold up the porch for the addition, two screen doors, [and] one solid door." *Id.* at 34. Owens told her that "some things were at his home and some at

another garage." *Id.* at 44. Zydallas "ended up renting [a] U-Haul and ... collect[ed] the materials." *Id.* Owens received the materials in July. *Id.* at 45. She then "request[ed] the money back for the work that wasn't done" over the next "six months." *Id.* She contacted Owens on a weekly basis, and the two "correspond[ed] back and forth." *Id.*

The Commonwealth's only other witness was Thomas Zedolik ("Zedolik"), the township's zoning officer. Zedolik testified that he originally received a phone call from Panatieri who "called ... about putting an addition on his home" and "said he had a contractor as a friend who could help him do the work." *Id.* at 79. Zedolik provided some advice and reviewed the original permit application submitted by Zydallas and Owens, which "didn't require any variances or anything" based on the proposed work. *Id.* Zydallas later submitted the "new zoning permit application" for the larger sunroom and Zedolik "determined that it would require four variances and a special exception from the zoning hearing board." *Id.* at 82. He thus denied that application "and then [Zydallas] submitted the appeal application requesting a variance and a special exception." *Id.* The appeal was granted.

Zedolik also handled inspections for the township and explained that "contractors are required to contact [him] for all inspections before any work is covered up." *Id.* at 83. He was asked only once to inspect Zydallas' property. On May 11, 2022, he "went to the property and into the existing building. There was no work started at all for any new addition that the permit

was issued for." *Id.* at 84. He observed "some remodeling work going on in the kitchen," and as to the electrical work he "made a note" for Owens to provide "the size of the branch circuit for the electrical" work. *Id.*

Zedolik also addressed the electrical box issue discussed by Zydallas. His office inspects only "from what they call point of attachment, where the electricity from the utility company enters the building." *Id.* at 88. The "supply side," i.e., the "load side ... of that point of attachment," is "regulated under the utility company" and he has "no authority over that." *Id.* The Commonwealth then asked Zedolik whether he knew if the transformer needed to be moved.

> Q. So do you know for this project if a transformer had to be relocated outside of the property?
>
> A. Originally, the original addition, the [ten] by [twenty], they showed it where the transformer was going to not interfere with that. We talked with [the utility company] about that, and then when they wanted to increase the size of that addition. We—I remember talking to them again, the engineer from [the utility company], and there was no mention – no agreement to move or relocate it. He had a design that and stay [sic] – I think, it was within three feet – they marked it out. There was some e-mails. I think I have one in my drawing there or in my file, the e-mail from the engineer.
>
> There was never going to be a relocation. That would've been too big of a project for the power company to do that for a project like this. It's in my file if you want to look at the e-mail and sketch that I received from the engineer.
>
> Q. You're testifying that the transformer didn't have to be relocated in this case?
>
> A. No, not for this project. That would've been a major undertaking by the utility company to move a transformer, because it feeds power not only to this apartment but multiple.

*Id.* at 88-89. He added that, in his experience, the utility company would have to move transformers. *Id.* at 89 ("I've never seen it where any general contractor or anybody else can touch any of that equipment.").

The Commonwealth charged Owens[3] with six crimes—two counts of home improvement fraud and various counts of theft—and the parties proceeded to a jury trial. The jury acquitted Owens of home improvement fraud and deceptive or fraudulent business practices but found him guilty of the remaining three theft offenses: theft for failing to make required deposits, theft by deception, and theft by unlawful taking.[4]

The trial court imposed an aggregate sentence of eighteen months of probation. Owens filed a timely appeal and a court-ordered concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). Owens raises the following questions for our review:

> 1. Was the evidence insufficient to support [Owens'] conviction for theft by failure to make required disposition of funds where there was no evidence that [Owens] failed to pay any contractors that the complainant allegedly paid for?
>
> 2. Was the evidence insufficient to support [Owens'] conviction for theft by false impression because the Commonwealth failed to prove that [Owens] intentionally created or reinforced a false impression that caused the victim to transfer her money?
>
> 3. Was the evidence insufficient to sustain [Owens'] conviction for theft by unlawful taking or disposition, movable property because

---

[3] The affidavit of probable cause states that Zydallas visited the local police department on May 16, 2022.

[4] 18 Pa.C.S. §§ 3927(a), 3922(a)(1), 3921(a).

the Commonwealth failed to prove that [Owens] intended to deprive the [c]omplainant of her property?

Owens' Brief at 2.[5]

Owens challenges the sufficiency of the evidence to support his convictions. We apply the following standards:

As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa. Super. 2019) (citation omitted). Whether the evidence is sufficient to sustain a conviction presents a pure question of law for which our standard of review is de novo. *Commonwealth v. Akeley*, 320 A.3d 106, 110 (Pa. Super. 2024).

**Theft by Failure to Make Required Disposition of Funds**

Owens' first issue challenges the sufficiency of the evidence to establish his guilt for the crime of theft by failure to make required disposition of funds. 18 Pa.C.S. § 3927(a). The Commonwealth must establish four elements to sustain a conviction of this offense:

1) the obtaining of the property of another; 2) subject to an agreement or known legal obligation upon the receipt to make

---

[5] The Commonwealth failed to file a brief.

specified payments or other disposition thereof; 3) intentional dealing with the property obtained as the defendant's own; and 4) failure of the defendant to make the required disposition of the property.

***Commonwealth v. Morrissey***, 654 A.2d 1049, 1052 (Pa. 1995).

Owens notes that caselaw requires proof that he "treated property or funds of another, designated to be used for [a] specific purpose, as if it were his own property." Owens' Brief at 8 (citing ***Commonwealth v. Wood***, 637 A.2d 1335 (Pa. Super. 1994)). He contends that the Commonwealth "made no attempt to explain how [Owens] violated this statute" at trial and there is no "evidence that [Owens] failed to remit funds to someone he was required to remit them to." ***Id.***

The trial court found that the evidence was sufficient to support his conviction of this offense. It first noted that it was undisputed Owens and Zydallas "entered into one or more contracts, or agreements, for home improvement services." Trial Court Opinion, 1/27/2025, at 6. Therefore, Owens "was aware of" the agreement and "was paid to complete certain interior home renovations and a home addition[.]" ***Id.*** at 7. According to the trial court, "in spite of having received the sum of $34,000.00 and other materials," Owens "completed little to none of the contracted renovations over the course of several years." ***Id.*** Responding to Owens' argument that the Commonwealth failed to show that any portion of the funds was designated for a specific purpose, the trial court cited Zydallas' testimony at trial that

some of the funds were intended to cover masonry work. We quote the relevant exchange:

> Q. If you could estimate how many times you asked or reached out, contact [Owens] for those funds?
>
> A. It was weekly. We did correspond back and forth. When I asked him about the $14,000 to come back from the masons, he told me the masons would have to sell a truck first to reco[u]p the $14,000 that he gave them.

N.T., 4/16-17/2024, at 45-46.[6]

The trial court therefore concluded that this $14,000 subset was to be paid to mason workers, and that our decision in **Commonwealth v. Crafton**, 367 A.2d 1092 (Pa. Super. 1976), supported the conviction. Trial Court Opinion, 1/27/2025, at 7-8 ("We do not think that [Owens'] failure to pay the masonry contractor is any different than the travel agent in **Crafton** who took a client's funds and failed to make payments toward their travel arrangements."). We thus address the case in some detail.

In **Crafton**, a travel agent received approximately $56,000 to book a trip to Las Vegas. Crafton received that money from another individual, who had, in turn, collected that sum from 252 individuals. **Id.** at 1093. Crafton then contracted with Fun Tyme, a New York-based wholesaler, for $50,800

---

[6] Owens argues that the trial court's own analysis refutes its conclusion, as the quoted testimony established that Owens paid the masons. However, Zydallas was simply referencing what Owens told her. Owens therefore attempts to draw inferences in his favor, as it presumes he was telling the truth and not attempting to mislead Zydallas.

and paid a $12,000 deposit. *Id.* Crafton failed to pay the balance and the participants did not receive their trip. *Id.*

Crafton was convicted of theft by failure to make required disposition of funds for failing to pay Fun Tyme. We affirmed. Our analysis focused on the second and fourth elements of the crime, as Crafton conceded the other two. *Id.* at 1095. As to the second element, Crafton argued that she had no definite duty to turn the money over to a specific person and thus "did not take the money subject to a duty to disburse." *Id.*

We disagreed because the evidence showed "[Crafton] took the money knowing that she would have to disburse the funds to others." *Id.* Regarding the fourth element, Crafton claimed that the evidence did not show "that the specific monies contributed by the complaining witnesses were not forwarded to" the wholesaler; additionally, as Crafton had paid $12,000 of the total, she argued the Commonwealth could not link those funds to any specific person who did not receive their trip. *Id.* We rejected both arguments based on the final sentence of the statute, which criminalizes the failure to make payments "notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition." 18 Pa.C.S. § 3927(a). We concluded that Crafton "did nothing criminal until she failed to pay Fun Tyme the balance due." *Crafton*, 367 A.2d at 1095.

Owens argues that **Crafton** is not on point since "it was undisputed that Crafton did not make the payment to the third party that she was supposed to make." Owens' Brief at 9. In contrast, "there is no actual evidence that [Owens] kept the mason's money for himself[.]" **Id.** Thus, the jury "could only have engaged in conjecture, speculation or guesswork to conclude from nearly non-existent circumstantial evidence that [Owens] failed to pay the masons." **Id.** at 9-10. He argues that nothing in the record warrants an inference that the contractual relationship designated any part of the funds to go to any specific purpose, as required by the first element. **Id.** at 8 ("There is no evidence that [Owens] 'treated funds' as if it were his 'own property,' nor is there any evidence that [Owens] failed to remit funds to someone he was required to remit them to.").

We agree. Initially, we note that the Commonwealth did not specifically allege that Owens failed to dispose of a specific subset of the entire sum received. Instead, the information alleged the following: "The Actor obtained property … in the amount of $37,986 belonging to … Zydallas[.]" Criminal Information, 3/28/2023.[7]

_____

[7] It appears this amount reflects the amount from the cashier's check plus other assorted costs Zydallas testified to at trial. We add that the listed amount requires that we assume Owens had to provide each dollar to someone else and therefore would make no profit on the contract.

As a general due process point pertaining to notice, the formal criminal information "sets the stage for trial and what the Commonwealth intends to

*(Footnote Continued Next Page)*

In **_Commonwealth v. Austin_**, 393 A.2d 36 (Pa. Super. 1978), a couple contracted with Austin for work on their home. The contract was for $4,175, with $2,495 paid in advance. **_Id._** at 37. Austin wrote on the receipt for the advance that the money was "for materials" and provided a separate receipt for a later payment that said, "for labor." **_Id._** Austin "began work on the project and continued performance for a period of approximately two months." **_Id._** However, as "work progressed, [Austin] realized there was more work to be done than he had originally anticipated" and "[r]ealizing the job was a losing proposition ... Austin discontinued work on the project." **_Id._** at 38. As of the day he discontinued the work, "Austin had spent only $1,243.00 for materials out of the sums advanced to him, [and] the [couple] charged him with theft by unauthorized disposition of the advance money paid on the contract." **_Id._**

We discharged the conviction, concluding that the advance payment became Austin's property and the Commonwealth thus failed to establish the first element's requirement that Austin obtained property belonging to another. He "received money under the contract, within the contract price,

_____

prove." **_Commonwealth v. King_**, 234 A.3d 549, 563 (Pa. 2020). Thus, the Commonwealth did not specifically present the theory cited by the trial court as it alleged that Owens was required to deposit $37,986. Nonetheless, while Owens complains that "[i]t is unclear what the Commonwealth's theory was that supported this particular charge from an evidentiary standpoint," Owens' Brief at 8, he does not specifically present a due process argument along these lines, and we do not decide the case on that basis.

as per the terms of the written agreement." *Id.* at 39.  This meant that "title as well as ownership of the money passed to [Austin].  His duty was to perform the services under the contract and failure to perform was a breach of that contract with its proper remedy in a civil forum." *Id.*

Similarly, when Zydallas caused the four cashier's checks to be provided to Owens, he took lawful title and ownership of those funds, and Zydallas no longer had any say as to how those funds were spent.  Indeed, we rejected the Commonwealth's argument in *Austin* that *Crafton* controlled on this point.  "In ... *Crafton* ... a travel agent received money which she was required to turn over to a travel wholesaler as payment for a scheduled tour.  This procedure made the travel agent exactly what her title says[:] an agent of the plaintiffs in turning their money over to a third person." *Id.*  We found the circumstances in *Austin* differed, however, as Austin "received advance money on a construction contract[.]" *Id.*

Even accepting that $14,000 was supposedly intended to be paid to the masons as a subcontractor, there is no evidence to establish that Owens acted as a trustee or agent of Zydallas with respect to that money.  We acknowledge that, in some cases, the failure to dispose of funds earmarked for a specific purpose can create criminal liability. *See Commonwealth v. Coward*, 478 A.2d 1384, 1387 (Pa. Super. 1984) (stating that "a person can be convicted of an embezzlement-type offense if he or she misappropriates funds for a use inconsistent with the purpose for which the funds are held").  However, the

record does not support an inference that any portion of the monies paid to Owens were designated for a specific purpose. As in *Austin*, the Commonwealth failed to present proof that there was a known legal obligation to use the funds for a specific purpose. We found that the notation "for materials" on the receipt for the advance payment was not "sufficient evidence to prove beyond a reasonable doubt that an agreement was specifically established that the $2,495.00 had to be used only for materials. *Austin*, 393 A.2d at 39. We stated that "[t]he total amount fixed in the contract was ... for both a materials and labor fund, and neither party had any amount specifically allocated for separate uses under the contract." *Id.*

Likewise in the case at bar, the contract signed by the parties in this case set a total amount and there was no proof that any specific amount was designated for a particular purpose or other entity. The contract paid Owens a total sum as a general contractor, which he would use to pay subcontractors and other workers to complete the work. Accordingly, we agree with Owens that the conviction of theft for failure to make the required disposition of funds is not supported by sufficient evidence.

**Theft by Deception**

Owens' second issue challenges his conviction of theft by deception, which criminalizes, in relevant part, the following:

**(a) Offense defined.--**A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

(1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

\* \* \*

**(b) Exception.--**The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

18 Pa.C.S. § 3922(a)(1), (b).  In general, "the Commonwealth must demonstrate the presence of a false impression and that the victim relied on that impression."  **Commonwealth v. Thomas**, 684 A.2d 1085, 1086 (Pa. Super. 1996).

In his concise statement, Owens asserted that the Commonwealth "failed to prove that [Owens] intentionally created or reinforced a false impression that caused the victim to transfer her money." Concise Statement, 1/14/2025, ¶ 3.  In its responsive opinion, the trial court declined to opine whether Owens harbored an intent to deceive when he obtained the funds, observing instead that "[i]t may be, as [Owens] argues, that the Commonwealth failed to prove that he, at the outset of the agreement, made a false impression which caused the homeowner to transfer her money to him[.]" Trial Court Opinion, 1/27/2025, at 12-13.  It continued, stating, "that is not the only theory of liability which the statute proscribes," as Owens is guilty if he intentionally "withholds the property of another through deception." **Id.** at 13.  The trial court concluded that this theory established

- 16 -

Owens' guilt, citing his statements to Zydallas that the transformer needed to be moved and that he knew someone who could do that work. *Id.* Because the zoning officer's testimony indicated that both statements were false, the trial court concluded that these "statements created or reinforced a false impression which the homeowner relied upon, and which caused her to delay her demand for a refund." *Id.* at 14.

In response to the trial court's opinion, Owens largely argues against the trial court's alternative theory that he withheld Zydallas' property by making false statements that delayed her request for a refund.[8] He argues that this theory is based on conjecture, as there was no proof that Zydallas relied on any alleged false statement to her detriment. Owens' Brief at 11. We agree.

As we stated in resolving Owens' first claim, the trial court is incorrect that Owens withheld Zydallas' property. The statute criminalizes "withhold[ing] property of another[.]" 18 Pa.C.S. § 3922(a). As set forth in our analysis above, the money became Owens' property pursuant to the contract and Zydallas therefore had no claim on the property.

Our disagreement with the trial court's analysis does not end the inquiry, as sufficiency of the evidence presents a pure question of law and we may

---

[8] The jury was instructed that it could find Owens guilty if he "intentionally obtained and/or withheld property consisting of $37,986." N.T., 4/16-17/2024, at 198.

- 17 -

affirm on any basis supported by the record. *See Commonwealth v. O'Drain*, 829 A.2d 316, 322 n.7 (Pa. Super. 2003). Accordingly, the question is indeed whether, "as [Owens] argues, that the Commonwealth failed to prove that he, at the outset of the agreement, made a false impression which caused the homeowner to transfer her money to him[.]" Trial Court Opinion, 1/27/2025, at 12-13.

The leading case in this area is *Commonwealth v. Gallo*, 373 A.2d 1109 (Pa. 1977). Gallo contacted David Leveto, a home building contractor. *Id.* at 1110. Gallo "represented himself as an 'account executive' for 'National Builders' Publications'" and proposed a brochure advertising Leveto's business to be delivered within ninety days. *Id.* The idea was that Leveto's existing subcontractors and suppliers would pay cash or give Leveto credit for space in the brochure; in exchange, they would benefit from the advertising. Leveto signed a contract on July 26, 1973, and provided addresses for his suppliers and subcontractors. *Id.* Gallo then contacted those businesses and collected $1,750. Leveto did not hear back from Gallo and, beginning in September 1973, tried calling approximately fifty times to no avail. *Id.* Leveto also sent three letters to Gallo's known mailing address. *Id.* Leveto visited the police, who investigated and discovered Gallo was the sole owner of National Builders' Publication and ran the business out of his home. *Id.* The Commonwealth filed charges and at some point thereafter Gallo completed the work, but Leveto refused to accept. *Id.*

Our Supreme Court discharged the conviction. The trial court and Superior Court had "emphasized that [Gallo] never answered Leveto's calls or answered his letters." *Id.* at 1111. The *Gallo* Court pointed out that the record established that the phone number and address were correct. *Id.* "With the ease by which [Gallo] could have been tracked down by his telephone number or post office box, we believe these facts show nothing; in fact, if probative of anything, they would tend to exculpate [Gallo], as they indicate a lack of intention to deceive." *Id.* The Court explained that the conviction required proof that "[Gallo] never intended to perform his part of the contract," and opined that the only evidence of this was "his failure to perform." *Id.* However, the statute, then and now, "specifically states that 'deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise.'" *Id.* (citation omitted). Thus, there was nothing to establish criminal liability beyond the mere failure to perform.

In ***Commonwealth v. Bentley***, 448 A.2d 628, 631 (Pa. Super. 1982), we discharged a conviction for theft by deception where Bentley, "who represented himself as 'Bentley Builders,'" contracted with "'an elderly couple'" and agreed to repair their porch for $841. *Id.* at 629. Bentley received a $280.33 down payment. *Id.* Twenty days later, the parties executed a new contract "calling for the original repairs plus rebuilding a garage for a total cost of $4,965[.]" *Id.* Bentley received an additional

advance of $1,655, which Bentley said that "he needed … because of personal family problems[.]" *Id.* Bentley worked between June 15 and June 26 of 1979, and "tore down the old porch and garage and installed a footer." *Id.* at 630 (citation omitted). Bentley then requested and received additional funds, ultimately receiving "approximately 87% of the contract price." *Id.* Bentley stopped working on June 27 and the couple "made repeated unsuccessful attempts to contact him, and then filed criminal charges in July, 1979, after which [Bentley] made several promises to resume work, but never did." *Id.* We noted that, as in *Gallo,* Bentley "supplied his correct name, address and phone number." *Id.* at 632. Additionally, he "expended substantial resources in attempting to fulfill his side of the bargain." *Id.* Thus, a finding that Bentley "never intended to perform" would be based on "his failure to perform," which is insufficient. *Id.*

In the case at bar, consistent with *Gallo* and *Bentley*, Owens' ongoing communications with Zydallas weigh heavily against a finding of deception as of the date Zydallas caused the money to be transferred to Owens. The record is clear that he and Zydallas frequently communicated via text message. On cross-examination, Owens confronted her with the content of some of those messages. Owens stated, "Now, the earliest of the messages that I got were from November 7, 2019," and "the latest ones" were dated "May 6, 2021[.]" N.T., 4/16-17/2024, at 67. Zydallas confirmed that the two were in contact throughout that timespan. *Id.* Owens thus did not provide false information,

nor did he avoid Zydallas after obtaining the money. Zydallas testified that the two remained in contact through at least December of 2021. *See* N.T., 4/16-17/2024, at 45. As in *Gallo*, "the ease by which" Owens could be tracked down "tend[s] to exculpate" as it "indicate[s] a lack of intention to deceive." *Gallo*, 373 A.2d at 1111.

The record supports the finding that Owens continued to work on the contract for over two-and-a-half years, and apparently failed to satisfactorily complete the work he did. However, the law is clear that the failure to perform is not itself sufficient. Furthermore, the lengthy timeline must be tempered against other facts established in the record. First, Zydallas agreed that she "knew [Owens] was doing this as a side project," as Owens had a full-time job. N.T., 4/16-17/2024, at 64. Second, Owens completed some of the interior work and the record establishes that unexpected complications arose during that work. Zydallas admitted that Owens had to jack the house to make interior repairs and encountered unexpected water damage. She simply viewed that work as encompassed by the contractual terms, as explored on cross-examination:

> Q. We are back to square one here. I believe you testified that the initial contract was supposed to cover installation of kitchen cabinets and a [ten] by [twenty] addition?
>
> A. Yes.
>
> Q. Would you agree, that [the contract] does mention [sic] the need to jack up the house because of extensive water damage or support beams?
>
> A. I'm sorry?

Q. You have the agreement in front of you?

A. Yes.

Q. Would you agree with me, that that agreement does not mention a need to jack up the house for any reason?

A. Correct.

Q. Okay. Can we agree, it does not mention a Mr. Owens installing a walk-up attic in the house?

A. Correct.

Q. Okay. Can we agree, it doesn't mention [Owens] redoing the mechanical room and pantry?

A. Redoing?

Q. Does it mention that?

A. No.

Q. Okay. Can we agree, it doesn't mention [Owens] replacing about nine feet of sewer line in the bathroom? It doesn't mention that, does it?

A. It says repair and remodel ... including repairing all rotted framing. So you asked about being jacked up to repair that. It does mention rotting and sheathing, which is the outside of the home.

N.T., 4/16-17/2024, at 63-64.

This exchange establishes that Zydallas and Owens had a difference of opinion regarding the interpretation of their contract. Moreover, this exchange establishes that Owens completed additional noncontractual work for Zydallas, which directly contradicts a finding that Owens had an intent to deceive Zydallas from the outset. **See also id.** at 68 ("You mentioned about an attic. I paid separately for that.").

- 22 -

Taken together, we agree that there was insufficient evidence presented to support a finding that Owens had no intention of performing the contract when he obtained the funds. The statute strictly forbids basing an intent to deceive on his failure to fulfill his promise. We therefore agree with Owens that this conviction must be vacated.

**Theft by Unlawful Taking**

Finally, Owens challenges his conviction for theft by unlawful taking. "A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof." 18 Pa.C.S. § 3921(a).

"The statutory provisions prohibiting theft by unlawful taking are general: they prohibit theft of any sort of 'movable property,' from any one or any place." *Commonwealth v. Lawson*, 461 A.2d 807, 812 (Pa. Super. 1983). The Commonwealth must establish three elements: "(1) unlawful taking or unlawful control over movable property; (2) ownership by another person of the movable property; and (3) intent to deprive permanently." *Commonwealth v. Carter*, 332 A.3d 867, 873 (Pa. Super. 2025) (citations omitted).

Our analysis of the two other issues resolves this issue because, as Owens asserts, the Commonwealth cannot prove that he "deprive[d] another person of their property." Owens' Brief at 13. The criminal information charged Owens with the intent to deprive Zydallas of all monies paid. As

- 23 -

previously explained, Zydallas did not have an absolute right, for purposes of these criminal statutes, to demand a full refund. That is an issue for the civil courts.

Accordingly, as addressed in our analysis of the first two issues, the money became Owens' property, and the Commonwealth failed to establish any intent to deceive as of the time he obtained those funds. We therefore conclude that the Commonwealth failed to establish any element of this crime.

**Conclusion**

Judgment of sentence vacated. Convictions discharged. Jurisdiction relinquished.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 12/30/2025